## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHNNY GREENE and MONICA GREENE,**
        Plaintiffs,

vs.                                                  No. 1:13-cv-00937-JAP/KBM

**BANK OF AMERICA, N.A., f/k/a/ BAC**
**HOME LOANS SERVICING,**
        Defendant.

### MEMORANDUM OPINION AND ORDER

        The DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED

COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) (Doc. No. 23) (Motion) asks the

Court to dismiss every count in Plaintiffs' first amended complaint for failing to state a claim

upon which relief can be granted. Plaintiffs Johnny and Monica Greene oppose the Motion. *See*

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO

FED.R.CIV.P. 12(B)(6) (Doc. No. 29) (Response). As discussed in detail below, the Court will

grant in part and deny in part Defendant Bank of America, N.A.'s (BANA's) Motion.[1]

### FACTUAL BACKGROUND

        Plaintiffs, Johnny and Monica Greene, own a home in McKinley County, New Mexico.

AMENDED COMPLAINT FOR VIOLATION OF REAL ESTATE SETTLEMENT

PROCEDURES ACT (RESPA), THE UNFAIR PRACTICES ACT (UPA),

MISREPRESENTATION, AND BREACH OF CONTRACT (Doc. No. 20) (FAC) ¶¶ 1, 7-8.

During all the time periods relevant to this lawsuit, BANA was the loan servicer for Plaintiffs'

home mortgage. *Id.* ¶ 5, 7. This lawsuit arises out of Plaintiffs' failed attempt to receive a loan

---

[1] In ruling on the Motion, the Court also considered DEFENDANT'S REPLY IN SUPPORT OF
MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(B)(6) (Doc. No. 30).

modification from BANA under the Home Affordable Modification Program (HAMP).[2] On April 10, 2009, BANA sent Plaintiffs a trial payment plan (TPP) agreement under HAMP. *Id.* ¶ 10. The TPP stated that BANA would modify Plaintiffs' loan if Plaintiffs (1) continued to meet the financial conditions for a modification, and (2) complied with the TPP by timely making three reduced trial payments in the amount of $1,329.90 per month. TPP, Exhibit A to FAC (Doc. No. 20-1).[3] Under the terms of the TPP, BANA agreed to "suspend any scheduled foreclosure sale," as long as Plaintiffs made the required trial payments. *Id.* at 4.

On May 7, 2009, Plaintiffs signed the TPP and returned it to BANA. *Id.* at 6; FAC ¶ 20. Plaintiffs proceeded to make timely trial payments during the months of May, June, July, August, and September of 2009. FAC ¶¶ 22, 24. By this time, Plaintiffs were "very concerned about the status" of their loan modification. *Id.* ¶ 25. As a result, Plaintiffs repeatedly called BANA; during these calls, they were told to keep making payments and that BANA would be sending Plaintiffs a permanent modification "any day now." *Id.* In accordance with this advice, Plaintiffs continued to make trial payments, which were accepted by BANA. *Id.* ¶¶ 26-27. However, BANA never provided Plaintiffs with a permanent loan modification. *Id.* ¶ 34. To the

---

[2] HAMP is a program established by the U.S. Department of Treasury to help struggling homeowners avoid foreclosure. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 554, 556 (7th Cir. 2012). The HAMP guidelines set out a three-step process for acquiring a loan modification from a HAMP participating servicer: (1) the loan servicer determines whether the borrower is eligible for a HAMP modification; (2) if so, the borrower makes reduced payments during a three-month trial payment period; and (3) if the borrower makes timely trial payments and continues to otherwise qualify for a modification, the servicer offers the borrower a permanent loan modification. *Id.* at 556-57.

[3] The first sentence of the TPP states: "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." TPP at 3. Section 3 explains that: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount . . ." *Id.* at 5. Section 2 requires Plaintiffs to make three timely trial payments of $1,329.90. *Id.* at 4.

contrary, in August 2011, while Plaintiffs were still waiting for a modification, BANA instituted a foreclosure proceeding against Plaintiffs.[4] *Id.* ¶ 49.

During this time period, BANA placed at least some of Plaintiffs' payments in a suspense account and reported to credit agencies that Plaintiffs were "seriously delinquent" on their payments. *Id.* ¶¶ 47, 90, 92.

On October 4, 2011, Plaintiffs' attorney sent BANA a letter identified as a "qualified written request" (QWR) under the Real Estate Settlement Procedures Act (RESPA) requesting information about Plaintiffs' mortgage loan. *Id.* ¶¶ 50, 52, 55.  Although BANA responded to this letter on January 4, 2012, Plaintiffs contend that the response was not "substantive." *Id.* ¶¶ 64, 76.

## PROCEDURAL BACKGROUND

On May 30, 2013, Plaintiffs filed a complaint in the Eleventh Judicial District Court of New Mexico asserting violations of RESPA, the Truth in Lending Act (TILA), the New Mexico Unfair Practices Act (UPA), as well as causes of action for misrepresentation and breach of contract. *See* Complaint for Violation of Real Estate Settlement Procedures Act (RESPA), Truth in Lending Act (TILA), the Unfair Practices Act (UPA), Misrepresentation, and Breach of Contract, Exhibit 2 to DEFENDANT'S NOTICE OF REMOVAL (Doc. No. 1-2) (Original Complaint). After removing the action to federal court, BANA filed its first motion to dismiss, in which it argued that Plaintiffs did not timely effect service of process.[5] Shortly thereafter, BANA

---

[4] The Court notes that it appears Plaintiffs are still residing in their home. *See* Motion at 18.

[5] *See* DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 4(M) AND 12(B) (Doc. No. 5). The Court ultimately denied BANA's first motion to dismiss, holding that Plaintiffs' October 17, 2013 service was timely. *See* ORDER (Doc. No. 15). In the current Motion, BANA briefly asserts that the Court lacks jurisdiction because BANA was not properly served. Motion at 3. BANA does not dispute that Plaintiffs served BANA on October 17, 2013. It appears that BANA is merely reasserting the same claim that the Court already denied. The Court will not revisit the issue in this MEMORANDUM OPINION AND ORDER.

filed a second motion to dismiss on the basis that the entirety of Plaintiffs' complaint failed to state a claim under Fed. R. Civ. P. 12(b)(6). *See* DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(B)(5) AND (6) (Doc. No. 14). The Court granted in part and denied in part BANA's second motion to dismiss. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 18). The Court denied BANA's motion to dismiss Plaintiffs' Count I RESPA claim and Plaintiffs' Count IV UPA claim. However, the Court dismissed Plaintiffs' Count II RESPA claim, Plaintiffs' Count III TILA claim, Plaintiffs' Count V misrepresentation claim, and Plaintiffs' Count VI and Count VII breach of contract claims without prejudice. The Court permitted Plaintiffs to file an amended complaint by January 31, 2014, which Plaintiffs did.

The present Motion, which seeks dismissal of Plaintiffs' FAC, is BANA's third motion to dismiss. In Plaintiffs' FAC, Plaintiffs continue to assert violations of RESPA and the UPA, as well as causes of action for misrepresentation and breach of contract.[6] *See generally* FAC. Like the original complaint, the FAC is slightly muddled. However, it is clear that Plaintiffs are asserting new theories of liability to support their state law claims. In the FAC, Plaintiffs allege that BANA induced Plaintiffs to enter a TPP agreement that BANA did not honor. *Id.* ¶¶ 85, 120-21. The FAC also contains additional factual support for Plaintiffs' original Count I RESPA claim, Count IV UPA claim, Count V misrepresentation claim, and Count VI breach of contract claim.

BANA attacks the FAC on three grounds: (1) the FAC contains new information, which warrants the dismissal of the two claims the Court previously considered and approved, (2) the FAC fails to cure the defects that the Court identified in the claims it previously dismissed

---

[6] Plaintiffs have abandoned their Count II RESPA claim, their Count III TILA claim, and their Count VII breach of contract claim. *See generally* FAC.

without prejudice, and (3) Plaintiffs' new claims are legally deficient. The Court will first

consider BANA's challenges to the claims Plaintiffs are reasserting. The Court will then address

Plaintiffs' new claims.

## DISCUSSION

### I.  Standard of Review

The Supreme Court has articulated a two-step approach for district courts to use when

considering a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court

should identify the adequately pleaded factual allegations contained in the complaint,

disregarding unsupported legal conclusions in the process. *Id.* at 678. While a complaint need not

include detailed factual allegations, it must contain "more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Id.* Next, having identified the adequately pleaded claims,

the Court "should assume their veracity and then determine whether they plausibly give rise to

an entitlement to relief." *Id.* at 679. In other words, "[t]o survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face." *Id.* at 678.

A claim is facially plausible when it "pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility

lies somewhere between possibility and probability; a complaint's "allegations must be enough

that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008).

**II.  The FAC**

   **A.  Count I: RESPA**

   In both the original complaint and the FAC, Plaintiffs allege that BANA violated RESPA by failing to provide a substantive response to a qualified written request (QWR) that Plaintiffs sent BANA on October 4, 2011. In the second motion to dismiss, BANA moved to dismiss this claim based on its contention that (1) the letter sent by Plaintiffs to BANA did not constitute a valid QWR under RESPA, and (2) even if the letter was a valid QWR, Plaintiffs were not entitled to any recovery because BANA's alleged failure to respond did not cause Plaintiffs pecuniary harm. The Court rejected both arguments. The Court noted that the original complaint alleged that Plaintiffs experienced "stress and anxiety" because BANA did not respond to their letter. Plaintiffs clarified that they were distressed by the "uncertainty as to what was being paid on their mortgage, uncertainty as to the amounts claimed as due on their note, uncertainty as of whether taxes and insurance were being paid." Original Complaint ¶ 31. As the Court explained, "stress and anxiety" is a cognizable injury satisfying the general requirement that a plaintiff suffer actual damages to recover under RESPA. *See McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010) (construing the term "actual damages" broadly to allow the plaintiff to recover non-pecuniary damages).

   In accordance with the Court's order, Plaintiffs are continuing to pursue their RESPA claim. Like the original complaint, the FAC alleges that BANA failed to provide a substantive response to Plaintiffs' QWR. However, Plaintiffs attached a copy of a response letter they received from BANA to the FAC. *See* January 4, 2012 Letter, Exhibit T to FAC (Doc. No. 20-20) (RESPA Response Letter). In light of this new information, BANA moves to dismiss Plaintiffs' RESPA claim on the basis that BANA's response to Plaintiffs was legally sufficient.

Plaintiffs admit that BANA's response was timely, but they contend it did not satisfy the requirements of RESPA because BANA refused to "respond to the large majority of QWR requests."[7] FAC ¶¶ 59, 74. This does not appear to be accurate.

In its letter, BANA provided information, or promised to provide information, about Plaintiffs' loan in response to eleven of Plaintiffs' fourteen questions. RESPA Response Letter at 2-3.[8] Plaintiffs have never explained how BANA's responses to these eleven questions are deficient. Instead, Plaintiffs take the position that the Court must accept as true their allegation that BANA's response was "not a substantive response pursuant to RESPA." Response at 4. This is incorrect. "[C]ourts are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, even if Plaintiffs' characterization of BANA's response is a factual, rather than a legal allegation, it is contradicted by the express terms of the RESPA Response Letter Plaintiffs attached to the complaint. As a result, the Court is not required to accept this allegation as true. *Hargrave v. Chief Asian, LLC*, 479 F. App'x 827, 830 (10th Cir. 2012) (quoting *Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972)). In the absence of any indication that the information BANA provided to Plaintiffs was incomplete, the Court will not surmise that BANA's responses were inadequate.

---

[7] In the FAC, Plaintiffs also assert that they did not "receive a notification of receipt" in violation of RESPA. FAC ¶ 76. It is not entirely clear what Plaintiffs mean, as Plaintiffs elsewhere acknowledge that they received a letter from a litigation specialist in response to their QWR stating that BANA was in receipt of the QWR. *Id.* ¶ 60. Plaintiffs allege that the number for the litigation specialist provided in this letter was disconnected. *Id.* ¶ 63. However, Plaintiffs never argue that BANA's failure to provide a working telephone number for the litigation specialist violated RESPA. The Court presumes Plaintiffs have abandoned this claim.

[8] In response to two inquiries, BANA informed Plaintiffs that information about unpaid payments and fees would be sent to Plaintiffs "under a separate cover." RESPA Response Letter at 2. Because Plaintiffs do not contend they never received this information, the Court presumes it was sent and accepted.

BANA did refuse answer three of Plaintiffs' inquiries: whether (1) Plaintiffs' loan was federally insured, (2) there had been any assignments, sales or transfers of the servicing of the loan, and (3) there were any notices of assignments, sales or transfers of the servicing of the loan. RESPA Response Letter at 2-3. BANA insists that it was not required to respond to these questions because these questions sought information outside RESPA's scope.

Under RESPA, a loan servicer is only required to respond to those portions of a QWR which seek "information relating to the servicing of [a] loan." *See* 12 U.S.C. § 2605(e); *Henson v. Bank of Am.*, 935 F. Supp. 2d 1128, 1144 (D. Colo. 2013). Requests for the identity of the holder of a loan or for loan origination documents do not pertain to the servicing of a loan and need not be answered. *See Henson*, 935 F. Supp. 2d at 1144-45; *Echeverria v. BAC Home Loans Servicing, LP*, 900 F. Supp. 2d 1299, 1306 (M.D. Fla. 2012) (a request for the promissory note does not relate to the servicing of the loan).

Like information about the holder of a loan, information about whether a loan is federally insured does not relate to loan servicing. BANA was not legally required under RESPA to respond to this request. In contrast, Plaintiffs' questions about whether the servicing of their loan was assigned do involve loan servicing. *See Henson*, 935 F. Supp. 2d at 1144 (finding that a request for the date the defendant took over servicing the loan related to loan servicing under RESPA). Insofar as BANA refused to reply to these questions, there was a technical violation of RESPA.

However, Plaintiffs are not entitled to recover damages for any and all RESPA violations. To state a claim for relief under RESPA, a plaintiff must allege facts supporting a finding that (1) the RESPA violation caused plaintiff actual harm, or (2) plaintiff is entitled to statutory

damages.[9] 12 U.S.C. § 2605(f). Although actual harm can include emotional distress, Plaintiffs

do not allege that BANA's failure to respond to their questions about the assignment of their loan

servicing caused them stress or anxiety. The FAC clearly indicates that Plaintiffs' distress was

caused by their concern about the amount due on the mortgage and whether taxes and insurance

were being paid. FAC ¶ 78. From the allegations in the FAC, it does not appear that Plaintiffs

had any real concern that BANA was not the loan servicer. Throughout 2009, 2010, and 2011

Plaintiffs exclusively corresponded with and called BANA regarding loan modification. *Id.* ¶¶

25-50. Moreover, BANA did indirectly respond to Plaintiffs' questions regarding the assignment

of loan servicing: the introduction of BANA's response to Plaintiffs QWR specifically states that

"Bank of America Home Loans" is the loan servicer. RESPA Response Letter at 1. Hence,

Plaintiffs have not sufficiently alleged that the only adequately pled RESPA violation caused

them actual damages. Thus, the Court will dismiss Plaintiffs' RESPA claim with prejudice.

### B.  Count II: UPA (false credit reports)

In the FAC, Plaintiffs continue to allege that BANA diverted their payments into a

suspense account and misrepresented to Plaintiffs and to various credit agencies the amount

owed on Plaintiffs' mortgage, thereby violating the UPA. BANA initially moved to dismiss this

---

[9] Statutory damages are available under RESPA when the plaintiff shows there has been a "pattern or practice" of noncompliance. 12 U.S.C. § 2605(f). Plaintiffs stipulate that the FAC does not state a claim for statutory damages. Response at 5. However, Plaintiffs ask the Court to dismiss their claim for statutory damages without prejudice so that Plaintiffs may have an opportunity for "full discovery" on this issue. *Id.* As an initial matter, even if the Court were to acquiesce to Plaintiffs' request, Plaintiffs would not be entitled to discovery on a dismissed claim. *See* FED. R. CIV. P. 26(b)(1). More importantly, "[a] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). The Court has already permitted Plaintiffs an opportunity to amend the complaint consistent with Fed. R. Civ. P. 11. Nonetheless, as Plaintiffs candidly admit, they remain unable to support a claim for statutory damages. Allowing Plaintiffs a second opportunity to amend the complaint would be futile. The Court will dismiss Plaintiffs' claim for statutory damages under RESPA with prejudice.

count of the original complaint because, according to BANA, Plaintiffs failed to plead any of the elements necessary to state a claim under the UPA. The Court denied BANA's motion and ruled that Plaintiffs stated a plausible claim for relief under the UPA. To help streamline the progression of the case, the Court encouraged Plaintiffs to provide BANA with extra information concerning the dates of the alleged misrepresentations and the identities of the credit agencies to which BANA allegedly communicated the misrepresentations.

In accordance with this suggestion, Plaintiffs amended the complaint alleging that BANA reported Plaintiffs as delinquent to Equifax, Experian, and TransUnion during the period in which Plaintiffs were making trial payments, namely May through September 2009.[10] FAC ¶ 47. Nonetheless, BANA contends that Plaintiffs "have failed to identify any negative credit reporting, and the claim fails as a matter of law." Motion at 15. The Court will not adjudicate this issue twice. Plaintiffs were not legally required to provide additional information to survive a motion to dismiss. Even if Plaintiffs had not followed the Court's suggestion, as BANA argues, this would not be grounds for dismissing their UPA claim.

BANA also contends that Plaintiffs' UPA claim must be dismissed because Plaintiffs agreed that BANA could place their trial payments in a non-interest bearing account until they totaled an amount equal to a normal monthly payment. As BANA points out, to state a claim under the UPA, a plaintiff must allege that the defendant made a false or misleading representation. *See Lohman v. Daimler-Chrysler Corp.*, 142 N.M. 437, 439 (N.M. Ct. App. 2007). BANA argues that placing money in a suspense account with Plaintiffs' consent is not misleading. The Court agrees; however, the Court does not understand Plaintiffs to be making the claim that the mere act of placing money in a suspense account is misleading. The gravamen

---

[10] While Plaintiffs never clearly state the exact dates during which they claim they were making timely trial payments, they explicitly state that timely payments were made in May, June, July, August, and September of 2009. FAC ¶ 24.

of Plaintiffs' UPA claim is that BANA made false credit reports to credit agencies. As the Court

stated in its previous MEMORANDUM OPINION AND ORDER (Doc. No. 18), if BANA was

making false credit reports Plaintiffs have a plausible claim for relief under the UPA. The Court

will not dismiss the Count II UPA claim.

### C.  Count III: Misrepresentation

The original complaint contained scant factual information concerning Plaintiffs'

misrepresentation claim. Plaintiffs merely alleged that BANA's "misrepresentation to the

Greenes of bringing their account current with agreed upon monthly payments via Western

Union was intentional and reckless." Original Complaint ¶ 64. The Court dismissed this claim

without prejudice, explaining that, to avoid dismissal, Plaintiffs should amend the complaint

consistent with Fed. R. Civ. P. 9(b) to (1) identify who made each alleged misrepresentation,

providing names if possible, (2) pinpoint when each alleged misrepresentation occurred, (3)

explain how each alleged misrepresentation was communicated to Plaintiffs, (4) paraphrase the

contents of each alleged misrepresentation, and (5) provide specific factual information

explaining how Plaintiffs' reliance on each alleged misrepresentation caused them harm.

In the FAC, Plaintiffs greatly augment their factual allegations. Plaintiffs now allege that

BANA offered Plaintiffs a trial payment plan on April 10, 2009, by sending Plaintiffs a letter in

which BANA promised to grant Plaintiffs a permanent loan modification if Plaintiffs complied

with the terms of the TPP. FAC ¶¶ 10, 85. Plaintiffs allege that they called BANA multiple times

in the fall of 2009 and spoke with representatives who told Plaintiffs to keep making payments

and that BANA would be sending a loan modification "any time now." *Id.* ¶ 25. To support their

claim that BANA encouraged Plaintiffs to continue making payments under the TPP, even

though BANA had already decided not to grant a loan modification, Plaintiffs attach a copy of

BANA internal call notes. One of these notes states: "Loan has been assigned to MHA Underwriting. DO NOT TELL the homeowner that the file has been cancelled. Underwriting results will determine next steps. Ensure the homeowner has submitted all required documentation and encourage homeowner to continue making trial payments." *Id.* ¶ 39; Internal Call Notes, Exhibit I to FAC (Doc. No. 20-9). This entry is dated February 10, 2010. *Id.* Finally, Plaintiffs state that they relied on BANA's promise to offer a permanent loan modification by making payments, via Western Union, to BANA. *Id.* ¶ 101.

BANA argues that these additional allegations fail to satisfy Fed. R. Civ. P. 9(b). As a preliminary matter, the Court notes that it required Plaintiffs to comply with Fed. R. Civ. P. 9(b) in stating a claim for intentional and reckless misrepresentation. Plaintiffs do not challenge this decision; however, Plaintiffs maintain that the FAC states a claim for both negligent and intentional misrepresentation. Response at 9. To the extent Plaintiffs bring a new claim for negligent misrepresentation the heightened pleading standards of Rule 9(b) do not apply. *See Tricontinental Indus., Ltd. v. Pricewaterhouse Coopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) (recognizing that Rule 9(b)'s heightened pleading standard does not apply to negligent misrepresentation claims); *Gen. Elec. Capital Corp. v. Posey*, 415 F.3d 391, 395-96 (5th Cir. 2005) (concluding that a negligent misrepresentation claim needs only to satisfy Rule 8(a)'s notice pleading standard). Under either Rule 8(a) or Rule 9(b), the allegations in the FAC fulfill the Court's requests (1) through (4) for additional information. Only request (5), a request for information about Plaintiffs' reliance, remains.

According to BANA, Plaintiffs' alleged reliance – submitting mortgage payments to BANA – was not detrimental, because Plaintiffs were contractually obligated to make payments to BANA under the terms of the original Note and Mortgage. Plaintiffs do not dispute that

detrimental reliance is a necessary element of a negligent or intentional misrepresentation claim.[11] Nonetheless, in the response, Plaintiffs make no attempt to explain how they were harmed by BANA's alleged misrepresentations. Instead, Plaintiffs simply assert this element has been satisfied. Response at 9-10. The Court disagrees.

While the Court accepts as true Plaintiffs' claim that they relied upon BANA's statements by making mortgage payments, these were payments Plaintiffs were contractually required to remit. It follows that these payments cannot constitute detrimental reliance. *See Toneman v. United States Bank*, No. cv 12-09369-MMM, 2013 U.S. Dist. LEXIS 84240, at *64-65 (C.D. Cal. Feb. 22, 2013) ("Plaintiffs' bare allegation that they submitted a loan modification application and made payments . . . is not adequate to plead detrimental reliance.") (unpublished); *Lawther v. OneWest Bank, FSB*, No. C–10–00054 JCS, 2012 WL 298110, at *19 (N.D. Cal. Feb. 1, 2012) (holding that there was no injury when, as a result of reliance, "the plaintiffs made payments that they were already obligated to make under the loan contract") (unpublished); *Barone v. Chase Home Fin. LLC*, No. CV 11–08016–PCT–FJM, 2011 WL 3665424, at *2 (D. Ariz. Aug. 19, 2011) (concluding that there was no detriment when the only result of plaintiff's reliance was "making payments to defendants that were already due") (unpublished).

Aside from the information concerning mortgage payments, the FAC contains no allegations specifying the nature of Plaintiffs' alleged harm. For example, Plaintiffs do not allege that their reliance on BANA's promises caused them to forgo other options for resolving their mortgage debt. Nor do Plaintiffs allege that they incurred any specific expenses, such as

---

[11] In New Mexico, detrimental reliance is an element of a fraudulent misrepresentation claim. *Saylor v. Valles*, 133 N.M. 432, 438 (N.M. Ct. App. 2002). Likewise, "to recover under a claim of negligent misrepresentation, . . . the injured party. . . must have sustained damages." *Ruiz v. Garcia*, 115 N.M. 269, 274 (1993) (superseded by statute on other grounds).

increased late fees, because of their decision to enter the TPP. Likewise, there are no allegations that Plaintiffs voluntarily entered into default, for the first time, by making the reduced trial payments, which then allowed BANA to foreclose when it would not otherwise have been able to do so. Finally, Plaintiffs do not claim that the delinquent balance that presumably accrued during the trial payment period was so high that Plaintiffs were unable to repay BANA after their loan modification was declined and, therefore, faced foreclosure. These are all conceivable types of detrimental reliance. Yet, in the absence of factual support, the Court cannot simply speculate that Plaintiffs were harmed in any of these ways. Under Rule 8(a), to survive a motion to dismiss, a complaint must include more than a "the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

Because Plaintiffs' complaint lacks the necessary information to support the element of detrimental reliance under Rule 8(a), Plaintiffs' allegations are also insufficient under the more stringent standards of Rule 9(b). Having already allowed Plaintiffs an opportunity to cure this defect in the original complaint, the Court will dismiss Plaintiffs' Count III negligent and intentional misrepresentation claims with prejudice.

### D.  Count IV: Breach of Contract (Note and Mortgage)

As in the original complaint, in the FAC, Plaintiffs assert that BANA breached the terms of the Note and Mortgage by placing Plaintiffs' payments in a suspense account rather than applying them to the outstanding balance. The Court originally dismissed this count of Plaintiffs' complaint without prejudice because Plaintiffs failed to explain how BANA's alleged breach harmed them. The Court instructed Plaintiffs that they needed to "explain what, if any, damages Plaintiffs suffered" as a result of BANA's alleged failure to post Plaintiffs' payments. Plaintiffs have failed to adequately follow the Court's direction. The FAC merely asserts that:

> The Bank is liable to the Greene's [sic] for breach of contract for actual damages, including accrual of fees and charges for the period after August 2009, having to retain counsel and pay attorney's fees and costs, and suffering ruined credit rating by the Bank's reporting on the debt as still delinquent or continuing to be delinquent despite the Greene's [sic]compliance with the terms of the TPP and continuing to make payments.

FAC ¶ 117. There are two problems with this part of the FAC. First, and most importantly, there are no allegations connecting the "actual damages" Plaintiffs seek to recover with BANA's alleged breach of the Note and Mortgage. This is a fatal flaw. In New Mexico, one of the elements of a breach of contract claim is that "the breach resulted in damages." *Armijo v. Wal-Mart Stores, Inc.*, 142 N.M. 557, 568 (N.M. Ct. App. 2007). Here, it is clear that some of the damages Plaintiffs seek to recover, namely damages for their ruined credit rating, flow from BANA's alleged breach of the TPP, not BANA's alleged failure to post Plaintiffs' payments under the terms of the Note and Mortgage. Similarly, there is no factual information in the FAC from which the Court can plausibly conclude that BANA's failure to post payments actually caused Plaintiffs to incur attorney's fees or any other unidentified "fees and charges." Second, Plaintiffs allegations are overly vague. Plaintiffs assert a claim for "fees and charges," without specifying the types of fees and charges they incurred. Plaintiffs' allegations do not put BANA on notice of the scope of the claim against them as required by Fed. R. Civ. P. 8.  The Court will dismiss Plaintiffs' Count IV breach of contract claim with prejudice.

### E.  Count II & Count V: Plaintiffs' New Claims

Plaintiffs' FAC contains two new claims: (1) Plaintiffs allege that BANA violated the UPA by representing that BANA would offer Plaintiffs a permanent loan modification under HAMP when it did not intend to do so, and (2) Plaintiffs allege that BANA breached the terms of the HAMP TPP by foreclosing during the trial payment period and by refusing to grant Plaintiffs a permanent loan modification. As BANA point outs, Plaintiffs cannot directly enforce HAMP

requirements as private litigants or as third-party beneficiaries to BANA's agreement with the

federal government. *Charter Bank v. Francoeur*, 2012-NMCA-078, 15 (N.M. Ct. App. 2012).

According to BANA, it therefore follows that Plaintiffs' HAMP-related claims must be

dismissed. In other words, BANA contends that Plaintiffs cannot pursue state law claims that

arise out of HAMP negotiations because there is no private right of action under HAMP.

 Numerous courts have rejected this argument. *See*, *e.g.*, *Wigod v. Wells Fargo Bank,

N.A.*, 673 F.3d 547, 581-82 (7th Cir. 2012) ("The end-run theory is built on the novel assumption

that where Congress does not create a private right of action for violation of a federal law, no

right of action may exist under state law, either"); *Sutcliffe v. Wells Fargo Bank, N.A.*, 283

F.R.D. 533, 554 (N.D. Cal. 2012) (rejecting "Wells Fargo's  contention that Plaintiffs' claims are

barred because they constitute an "end-run" around HAMP"); *Olivares v. PNC Bank, N.A.*, No.

11–1626 ADM/JJK, 2011 WL 4860167, at *5 (D. Minn. Oct. 13, 2011) ("[T]he mere fact

Plaintiffs' claims arise from a fact pattern implicating HAMP does not preclude them from

asserting claims premised upon the common law and statutory law of Minnesota."); *Darcy v.

CitiFinancial, Inc.*, No. 1:10–cv–848, 2011 WL 3758805, at * 4 (W.D. Mich. Aug. 25, 2011) ("a

state-law breach of contract claim [is] not preempted or otherwise generally precluded by

HAMP"); *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 350 (D. Mass. 2011)

("Whether HAMP creates a private right of action or a cognizable property interest is not the

issue in this case. Plaintiffs have brought suit on the theory that the TPP constituted a contract

between defendant and plaintiffs, and that defendant breached that contract. Their claims arise

under defendant's alleged failure to comply with its contractual obligations in the TPPs").

 The Court finds these cases persuasive. Moreover, none of the cases cited by BANA

effectively undermine the conclusion that Plaintiffs' claims are not precluded by HAMP. First,

16

BANA cites *Charter Bank*. In *Charter Bank*, the defendant, a homeowner, argued that borrowers should be able to enforce HAMP servicer participation agreements – agreements between HAMP-participating servicers and the federal government – as intended third-party beneficiaries. *Charter Bank*, 2012-NMCA-078 at 12-13. Like most courts, the New Mexico Court of Appeals rejected this argument, holding that "borrowers do not have a private cause of action to enforce HAMP regulations because borrowers are incidental beneficiaries, not third party beneficiaries under HAMP." *Id.* at 15. In other words, a borrower cannot force a loan servicer to offer the borrower a permanent loan modification merely because the loan servicer is contractually required to do so under a HAMP servicer participation agreement.

This is not the equivalent of holding that a loan servicer is completely immune from any suit arising from HAMP loan modification activities. In fact, in *Charter Bank*, the New Mexico Court of Appeals implicitly recognized that a plaintiff may pursue a New Mexico state law claim that is related to HAMP. After rejecting the defendant's attempts to directly enforce HAMP, the New Mexico Court of Appeals subsequently considered whether the foreclosure that the defendant challenged should be equitably estopped because the defendant "reasonably relied on [the loan servicer's] misrepresentations regarding approval of the loan modification." *Id.* at 19. *Charter Bank* does not bar Plaintiffs from pursuing New Mexico state law UPA and breach of contract claims based on BANA statements to Plaintiffs concerning a HAMP modification.

Neither does *Miller v. Chase Home Finances, LLC*, 677 F.3d 1113 (11th Cir. 2012) (per curium), another case cited by BANA. Like the Court in *Charter Bank*, the Court in *Miller* held that a borrower lacks standing to pursue state law causes of action "insofar as they are premised on an alleged breach of [a loan servicer's] HAMP obligations." *Id.* at 1117. Here, Plaintiffs' claims are not premised solely on a violation of BANA's obligations under HAMP. Plaintiffs'

claims arise from written statements BANA made regarding its intention to modify Plaintiffs' loan.

BANA also cites *Gunnell v. Fannie Mae*, No. 2:11–CV–407 TS, 2013 WL 588901 (D. Utah 2013) and *Marks v. Bank of America, N.A.*, No. 03:10–cv–08039–PHX–JAT, 2010 WL 2572988 (D. Arizona 2010) to support the proposition that Plaintiffs cannot sue BANA for breach of the TPP because the TPP is a "HAMP document." Motion at 20. Again, *Gunnell* and *Marks* do not involve an independent TPP agreement. The only case cited by BANA which endorses its position is *Shurtliff v. Wells Fargo Bank, N.A.*, No. 1:10–CV–165 TS, 2010 WL 4609307 (D. Utah 2010), which states:

> Plaintiff appears to argue that he was entitled to a loan modification under HAMP. However, as Defendants correctly point out, there is no private right of action under HAMP . . . Plaintiff next alleges that Defendants breached the verbal contract they made with Plaintiff. This claim is essentially a claim for a HAMP modification, which must fail for the same reason set forth above.

*Id.* at *3. The Court in *Shurtliff* does not provide any direct support for this conclusion beyond a citation to *Marks*, a case which does not address the issue of whether HAMP prevents a plaintiff from pursuing a breach of contract claim based on a loan servicer's independent statements or promises. The Court is not persuaded that HAMP bars or somehow preempts Plaintiffs' claim that BANA violated the UPA and breached its contractual obligations when it allegedly induced Plaintiffs to enter a TPP that it did not honor. Because BANA does not otherwise challenge Plaintiffs' new UPA claim, the Court will allow the claim to proceed. The Court will consider BANA's other challenges to Plaintiffs' Count V breach of contract claim below.

###### i.       BANA's Contractual Obligations under the TPP

BANA argues that Plaintiffs' Count V breach of contract claim fails because BANA was not obligated under the terms of the TPP[12] to refrain from instituting foreclosure proceedings or to grant Plaintiffs a permanent loan modification. After carefully reviewing the TPP, the Court has concluded that, while the language of the TPP is at times equivocal, it is certainly plausible that the TPP (1) required BANA to avoid foreclosure during the trial payment period and (2) obliged BANA to grant Plaintiffs a permanent loan modification.

First, under the TPP, BANA agreed to "suspend any scheduled foreclosure sale" as long as Plaintiffs remained in compliance with the TPP. TPP at 4. This provision, Section 2B, explains that "any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates." *Id.* BANA contends that these terms are clear: BANA was only required to suspend foreclosure sales, not all foreclosure proceedings.  Although the Court recognizes that Section 2B does not directly address whether BANA is permitted to institute a new foreclosure action during the trial payment period, the Court does not agree that the meaning of Section 2B is clear.

When a "contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781 (1993). Under Section 2B, Plaintiffs waived the right to certain notices in the event that BANA resumed a foreclosure

---

[12] Although Plaintiffs signed the TPP, there is no allegation that a BANA representative executed the TPP in the space provided. While the Court is aware that there is case law holding that a TPP unsigned by a lender's agent is unenforceable, *see, e.g.*, *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548, 554 (5th Cir. 2012) (unpublished) ("[T]he TPP does not take effect until the borrower and the lender sign it and the lender provides the borrower a signed copy."), BANA never challenges the TPP on these grounds. To the contrary, BANA takes the position that the TPP "modified the original Note and Mortgage." Motion at 15. In addition, as Plaintiffs emphasize, BANA's correspondence with Plaintiffs indicates that BANA believed the TPP was in effect by early 2010. January 19, 2010 Letter, Exhibit G to FAC (Doc. No. 20-7); January 23, 2010 Letter, Exhibit H to FAC (Doc. No. 20-8). For the purposes of ruling on this motion, the Court assumes that BANA assented to the terms of the TPP.

action upon the termination of the TPP. This part of Section 2B suggests that BANA would be suspending all foreclosure proceedings, not just foreclosure sales, during the trial payment period. As a result, Section 2B could be reasonably construed by an ordinary consumer to indicate that BANA would not institute a new foreclosure action. Because this provision of the TPP is ambiguous it would be inappropriate for the Court to resolve its meaning at this stage in the proceedings. *See Elliott Indus. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1108 (10th Cir. 2005) ("If a contract is ambiguous, the jury or the court must engage in factfinding to determine the meaning of the contract.") (citing *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 127 N.M. 1 (1999)); *Mellekas*, 114 N.M. at 782 (explaining that a fact-finder "may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent" before determining the meaning of an ambiguous contract); *Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim."). The Court does not accept BANA's first assertion that the TPP did not obligate BANA to avoid foreclosure during the trial payment period.

Second, there is clear language in the TPP to support Plaintiffs' claim that BANA promised Plaintiffs a permanent loan modification if Plaintiffs complied with the terms of the TPP and financially qualified for a HAMP modification. The first sentence of the TPP states: "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender **will** provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the

20

Mortgage." TPP at 3 (emphasis added). Similarly, Section 3 explains that: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender **will** send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount . . ." *Id.* at 5 (emphasis added).

BANA cites an arguably conflicting provision of the TPP, Section 2G, which reads: "I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed." *Id.* According to BANA, this provision demonstrates that BANA did not guarantee Plaintiffs a permanent loan modification. It appears that BANA's argument is that it had complete discretion whether or not to send Plaintiffs an executed copy of a Modification Agreement. This position is belied by the language quoted above, which affirmatively states that BANA will send the Modification Agreement if Plaintiffs meet certain conditions precedent.

Furthermore, as the Seventh Circuit recently expounded, BANA's interpretation of the TPP "turns an otherwise straightforward offer into an illusion." *Wigod*, 673 F.3d at 563. Plaintiffs advance a more reasonable interpretation: if Plaintiffs complied with the terms of the TPP, BANA was required to offer Plaintiffs a permanent loan modification. *See id.* ("[A] reasonable person in Wigod's position would read the TPP as a definite offer to provide a permanent modification that she could accept so long as she satisfied the conditions."); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 234 (1st Cir. 2013) ("The TPP's plain terms therefore required Wells Fargo to offer her a permanent modification."); *Corvello v. Wells Fargo Bank,*

*NA*, 728 F.3d 878, 883 (9th Cir. 2013) ("The more natural and fair interpretation of the TPP is that the servicer must send a signed Modification Agreement offering to modify the loan once borrowers meet their end of the bargain.").

To the extent Section 2G throws doubt on the nature of BANA's obligations under the TPP, the Court is mindful that BANA drafted the TPP. In New Mexico, as in other states, "any uncertainties in a contract must be construed most strongly against the party who drafted it," *Manuel Lujan Ins., Inc. v. Jordan*, 100 N.M. 573, 576 (1983).  In light of this rule of construction, the Court is especially skeptical of BANA's self-serving interpretation of the TPP. Plaintiffs' claim that the TPP obligated BANA to offer Plaintiffs a permanent loan modification if Plaintiffs complied with the TPP is more than plausible. Therefore, the Court will deny BANA's motion to dismiss this portion of Plaintiffs' Count V breach of contract claim.

### ii.        Emotional Distress Damages

BANA contends that Plaintiffs are not entitled to recover emotional distress damages based on the alleged breach of the TPP, because the nature of the contract, a mortgage modification, was "purely financial" and neither party contemplated emotional distress damages arising from a breach. Plaintiffs agree that an aggrieved party is not normally permitted to receive damages for an emotional disturbance caused by a breach of contract. However, Plaintiffs point out that there is an exception for cases where emotional distress is particularly likely to result from the breach. Plaintiffs argue that there is a plausible claim for emotional distress damages based on the nature of the contract and that the Court should refrain from making a final decision until there has been more discovery concerning the egregiousness of BANA's behavior.

Under New Mexico law, a plaintiff may recover for mental anguish caused by a breach of a contract, "[w]here the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude. . . that a breach . . . will necessarily or reasonably result in mental anguish or suffering." *Flores v. Baca*, 117 N.M. 306, 311 (1994). In determining whether emotional distress damages are appropriate, a court should consider the purpose of the contract and the foreseeability of emotional distress damages. Courts are especially likely to award emotional distress damages if "the purpose of the contract would be frustrated unless damages for mental anguish were awarded for breach." *Id.* For example, In *Flores*, the Court permitted the plaintiffs to recover a mental anguish award arising from the breach of a funeral services contract. *Id.* at 314.

The New Mexico rule concerning emotional distress damages accords with the approach taken in the Restatement 2d of Contracts, § 353, a section which the New Mexico Supreme Court quoted favorably in *Flores*. According to the Restatement, "[r]ecovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." *Id.* at 314. In assessing how a New Mexico court would apply this rule to the facts at hand, the Court is guided by *Akutagawa v. Laflin, Pick & Heer, P.A.*, 138 N.M. 774 (N.M. Ct. App. 2005), a more recent New Mexico case, which paraphrases the rule from *Flores* stating: "New Mexico allows recovery for stand alone emotional distress only in limited circumstances, including. . . in contractual situations where the specialized nature of the contract naturally contemplated that reasonable care would be taken to avoid the infliction of severe emotional distress." *Id.* at 779.

The Court is also cognizant that courts in the District of New Mexico have been reluctant to expand the *Flores* exception outside the context of highly sensitive personal services

contracts. *See Pedroza v. Lomas Auto Mall, Inc.*, 625 F. Supp. 2d 1156, 1161 (D.N.M. 2009) (holding that plaintiff could not recover a mental anguish award based on defendant's breach of the warranty of title for a used automobile); *Yumukoglu v. Provident Life & Accident Insurance Company*, No. CIV 99-1245 BB/WWD, slip op. at 12 (D.N.M. May 31, 2001) (unpublished) ("[I]nsurance contracts are designed to protect pecuniary, as opposed to mental, well-being. They do not present the "exceptional circumstance" contemplated by Flores."); *Shield v. Monarch Properties*, Inc., No. 04cv0858 PK/DJS, slip op. at 10 (D.N.M. September 30, 2005) (unpublished) (holding that a disabled plaintiff who was distressed by an apartment complex's failure to provide accessibility features, which was in breach of contract, could not recover emotional distress damages because a "residential lease lacks special emotional significance necessary for recovery of emotional distress damages").

Moreover, the majority rule, in state courts, seems to be that "contracts pertaining to one's dwelling are not among those contracts which, if breached, are particularly likely to result in serious emotional disturbance." *Hancock v. Northcutt*, 808 P.2d 251, 258-259 (Alaska 1991); *see also Maere v. Churchill*, 116 Ill. App. 3d 939, 944 (Ill. App. Ct. 3d Dist. 1983) ("Even though real estate is unique and the attorney-client relationship is a fiduciary one, we are unable to conclude that serious emotional disturbance is a particularly likely result of an attorney's breach of contract in his examination of title to real estate.").

While the Court is sympathetic to Plaintiffs' claim that they have been distressed by BANA's conduct, Plaintiffs have not convinced the Court that there are sufficient reasons to deviate from the general rule that Plaintiffs may not recover emotional distress damages for a breach of contract. Unlike in *Flores*, the contract at issue in this case, the TPP, is not a personalized contract that was "made for the very purpose of providing . . . mental well-being."

*Flores*, 117 N.M. at 311. Plaintiffs have alleged a calculable financial interest as well as an emotional interest in the TPP. For this reason, the Court is not convinced that the purpose of the TPP would be frustrated if the Court disallows emotional distress damages. The Court notes that Plaintiffs' Count V breach of contract claim will nonetheless proceed because Plaintiffs also allege that BANA's breach caused them pecuniary harm, for example, by depriving Plaintiffs of a reduced interest rate.

## III. Remaining Claims

Based on the Court's rulings, at this point, the following claims will proceed: (1) Plaintiffs' Count II claim that BANA violated the UPA by making false credit reports, (2) Plaintiffs' Count II claim that BANA violated the UPA by inducing Plaintiffs to enter the TPP, (3) Plaintiffs' Count V claim that BANA is liable for pecuniary damages for breaching the TPP.

IT IS THEREFORE ORDERED THAT:

1. DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) (Doc. No. 23) is granted in part and denied in part.

2. The Court will dismiss Plaintiffs' Count I RESPA claim, Count III misrepresentation claim, and Count IV breach of contract claim with prejudice.

3. Plaintiffs' Count V breach of contract claim is dismissed with prejudice to the extent Plaintiffs seek to recover emotional distress damages.

SENIOR UNITED STATES DISTRICT JUDGE